**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **2:08-cr-299** |
| **v.** | ) | |
| | ) | |
| **ALLEN BROWN also known as** | ) | |
| **ALLAN BROWN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

Pending once again before the Court is DEFENDANT ALLEN BROWN'S MOTION TO SUPPRESS EVIDENCE UNDER FRANKS V. DELAWARE WITH CITATION TO AUTHORITY. Doc. No. 51. This most recent occasion is the result of the April 8, 2011, Memorandum Opinion and Order of Court (Doc. No. 80) granting the GOVERNMENT'S MOTION TO RECONSIDER ORDER GRANTING SUPPRESSION ON THE BASIS OF NEWLY DISCOVERED EVIDENCE (Doc. No. 74). Defendant's motion to suppress, originally filed on June 25, 2009, sought to suppress the biological material obtained from him on February 20, 2008 pursuant to a search warrant, and the results of a DNA analysis performed on the biological material. Doc. No. 51. The basis for the motion was Defendant's contention that the affidavit of probable cause in support of the application for the search warrant contained material omissions and false statements, and, therefore, failed to establish probable cause. *Id.*

A hearing on the motion was conducted on July 31, 2009, after which the Court granted Defendant's motion and suppressed the evidence in a Memorandum Opinion and Order of Court dated August 12, 2009. *See* Doc. No. 60 (reported at *U.S. v. Brown*, 647 F.Supp.2d 503 (W.D. Pa. 2009)). In so doing, the Court found that subparagraph 7(c) of the affidavit of probable cause

contained certain materially false statements; statements that were made with a reckless disregard for the truth; and that such statements were material to the finding of probable cause. *Id*. Setting aside the affirmative misstatements of the subparagraph, as required under the stricture of the United States Supreme Court decision of *Franks v Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Court found probable cause was lacking in the application for the warrant to seize the DNA evidence, and granted the motion. *Id*. The Court also found that the affidavit of probable cause contained material omissions, specifically information involving Defendant's uncle and possible suspect, John Wingate. *Id*. While the Court found that the material false statements coupled with the omissions justified granting Defendant's motion, the Court did not rule on whether the omissions, in and of themselves, warranted suppression. *Id*.

A series of evidentiary and procedural developments have occurred that affect the Court's previous ruling, the germane details of which will be described *infra*. For the reasons as set forth herein, the Court will vacate its original order granting Defendant's motion to suppress the evidence, and will deny the motion to suppress evidence filed at Doc. No. 51.

## BACKGROUND AND PROCEDURAL HISTORY

The facts of the underlying crime and investigation have previously been outlined by the parties before this Court and the U.S. Court of Appeals for the Third Circuit in *U.S. v. Brown*, Court of Appeals Docket # 09-3643, and are generally not in dispute. On October 1, 2007, two armed men robbed the S & T Bank in Ford City, Pennsylvania, at approximately 9:15 a.m. In the course of the robbery, the two men wore identical Halloween scream-type masks that covered their entire heads. They robbed the bank at gunpoint, and upon exiting the bank building, fled on foot and proceeded in the direction of the Armstrong County School District Administration

building.  At the time, an unattended school district delivery van was parked outside the administration building, with its doors open and the keys in the ignition, as the driver was making a delivery inside the building.  The van was presumably taken by the bank robbers and driven to an area approximately one half mile away, where it was apparently abandoned along Hobson Drive, near the intersection with Pennsylvania State Route 66 ("SR 66").  Hobson Drive is a two-lane road with no curbs or sidewalks.  Approximately thirty (30) minutes later, the van was found at that location and processed by police. Upon search, the police recovered a scream-type mask inside the van. The second mask was not found.

Shortly after the robbery, an investigation was initiated by the Pennsylvania State Police ("PSP").  The investigation was led by Trooper First Class Shane W. Lash from the nearby Kittanning station.  Special Agent Robert Smith of the Pittsburgh branch of the Federal Bureau of Investigation ("FBI") also responded to the robbery scene that morning.  Special Agent Smith and Trooper Lash agreed that the PSP would assume the lead role in the investigation.  Trooper Lash did, however, provide Special Agent Smith with periodic updates regarding the status of the investigation.  *See* Doc. No. 75, Transcript of the July 31, 2009 suppression hearing at Tr. p. 43.

On or about January 23, 2008, at the request of Trooper Lash, Special Agent Smith prepared an affidavit to support a search warrant application for the collection of a DNA sample from Defendant.  The affidavit was prepared by an Assistant United States Attorney in Pittsburgh with information from Special Agent Smith, who reviewed and authorized the affidavit before forwarding it to the Baltimore field office of the FBI on or about February 4, 2008, with instructions to apply for the search warrant.  On February 14, 2008, Special Agent James J. Mollica, Jr., presented the application and affidavit for a search warrant to U.S. Magistrate Judge

Thomas DiGirolamo in Greenbelt, Maryland, who reviewed it and issued the warrant on February 14, 2008. *See* Search Warrant, filed at Doc. No. 51 as exhib. 1.

As the record now reveals, a divergence occurred between what actually followed in the course of the investigation in and around October of 2007, and what key participants of the investigation were subsequently able to recall about the course of the investigation at the time Defendant's motion to suppress was originally considered in the summer of 2009. A description of the development of the evidentiary record as presented to the Court is appropriate.

1.    July 2009: First Suppression Hearing

The following description reflects the evidence presented during the suppression hearing conducted on July 31, 2009 (the "first suppression hearing"), and was the factual basis for the Court's original ruling to grant Defendant's motion to suppress. In the early stages of the investigation, PSP Troopers conducted numerous interviews of potential witnesses. Several witnesses reported having seen an unoccupied car parked in the same spot where the stolen van was later found on Hobson Drive between 8:00 a.m. and 9:00 a.m. on the morning of the robbery. *See Brown*, 647 F.Supp.2d at 507. The witnesses' descriptions of the vehicle were generally consistent: two described it as a silver Volkswagen Jetta, one as a gray car, one as a silver car, and one as a white car with a blue stripe. *Id.* Each witness recalled seeing something hanging from the driver's side mirror, and two witnesses described the car as having white license plates (one specifically identified the plates as Maryland plates.) One witness reported seeing a black male driving the same car away from the general area at approximately 9:25 a.m., ten minutes after the robbery. Special Agent Smith did not participate in the interviews of the witnesses who provided this information. *See* Transcript of Suppression Hearing filed at Doc.

No. 75 at p. 87.

The information from these witnesses became known to Special Agent Smith through conversations with Trooper Lash, who also memorialized same in a PSP Incident Report. Special Agent Smith incorporated this information in the affidavit of probable cause for a search warrant on or about January 23, 2008. *Id.* at pp. 87-88. Special Agent Smith did not receive a copy of Trooper Lash's report until January 26, 2008, three days after drafting the affidavit. *Id.* at p. 90.

Defendant Brown moved to suppress the DNA evidence from the scream-type mask on the basis of purportedly false information in the affidavit of probable cause, particularly information contained in paragraph 7(c), which stated:

> Police interviews of various witnesses following the robbery reported witnessing the stolen Armstrong County School Administration van meet up with a silver Volkswagen Jetta having a possible Maryland registration. Witnesses then observed the silver Jetta drive away from the area where the van was left parked.

During the first suppression hearing, Special Agent Smith testified regarding the statements in paragraph 7(c) as follows:

> Q.     Now, during the course of the investigation, did you personally get involved in the interview of any of the witnesses who observed the Volkswagen Jetta?
>
> A.     I did not.
>
> Q.     Did you get involved in the interviews of anyone relative to the van being stolen?
>
> A.     I did not.

*See* Doc. No. 75 at 84-85. Special Agent Smith further testified regarding any personal notes he took during the course of the investigation. More specifically, he was asked by counsel for

Defendant about any notes he may have taken during his conversations with Trooper Lash:

Q.    Trooper Lash communicated with you, correct?

A.    At some point I believe he did.

Q.    He updated you on the progress of the investigation on November 13, correct, 2007?

A.    Who did?

Q.    Trooper Lash.

A.    Possibly.  I'm not sure of the exact date but –

Q.    When you had these conversations with Trooper Lash, did you make any record of them to assist you in remembering your conversations with him?

A.    I may have take a few personal notes but nothing that would be entered into the file.  This is a permanent record.

Q.    So, you didn't like, for example, prepare a memorandum or 302, something of that nature, heard from Lash, told me Myschisin thinks it's John Wingate? You didn't do anything like that kind of chronological thing for the file?

A.    No, realizing he had his own particular file and again realizing - well, my understanding - well, my position was that we were assisting in the investigation, but again, the state troopers were the lead agency.  So the reports would have to be filed with them.

Q.    So the personal notes that you took, where are those now?

A.    I have no idea.  They weren't associated with any particular 302 or report that I would have been producing, so they could have been thrown away.

Q.    You might have just written it down and thrown it away, but you don't know?

A.    Yes.

Q.    Would they be in the file?

A.    Typically, when I would save notes is when they would be as a result of a

particular interview, not necessarily with a trooper or another officer unless they had substantive information to provide.

Q.      So you had no personal notes to refer to then when you prepared the affidavit, correct?

A.      I may have taken notes of the occasion I spoke with Trooper Lash but after producing the affidavit and reviewing it and believing it to be true and correct, I most likely threw those notes away.

Q.      Most likely or did?

A.      I don't have them so I have to say I did.

*Id.* at pp. 100-02.  Upon conclusion of the hearing, this Court found:

Defendant challenges paragraph 7(c), correctly asserting that "the affidavit stated falsely that witnesses reported seeing a stolen Armstrong County School District van, which was the apparent getaway vehicle, 'meet up with a silver Volkswagen Jetta having a possible Maryland registration,' and that 'witnesses then observed the silver Jetta drive away from the area where the van was left parked.'"  Doc. # 51 at p. 2.  The government concedes that the first sentence of paragraph 7(c) is false.  Doc. # 53.  The Court agrees.  From the testimony and evidence, no witnesses saw the subject vehicles stopped, parked, or present at the same place at the same time, and no witnesses saw any person(s) moving from one of the vehicles to the other.

*Brown*, 647 F.Supp.2d at 511.  The finding was consistent with the testimony of witnesses, which was uncontroverted at the time by any other evidence.

2.      Appeal of the United States to the Suppression of Evidence

The government appealed the suppression of evidence, during the process of which it conceded that the warrant affidavit contained a materially false statement at paragraph 7(c). More particularly, the government's appellate brief noted in relevant part:

Regarding the witness statements concerning the vehicle parked on Hobson Drive the morning of the robbery, the affidavit stated:

Police interviews of various witnesses following the robbery reported witnessing the stolen Armstrong County School Administration van meet up

7

with a silver Volkswagen Jetta having a possible Maryland registration. Witnesses then observed the silver Jetta drive away from the area where the van was left parked.

(App. 67).  **This statement, however, was incorrect as no witness had actually seen the van "meet up" with the Jetta. Instead, witnesses had reported seeing the Jetta parked on Hobson Drive where the van was later recovered, and one witness had also reported seeing a silver Jetta driving away from the area near Hobson Drive approximately 10 minutes after the robbery** (App. 172-173)

On January 26, 2008, after Agent Smith had approved the affidavit but before it was executed, Agent Smith received a lengthy report from Trooper Lash, detailing the numerous witness interviews that had taken place (App. 215, 220). Agent Smith did not carefully review this report, however, because he believed that he had a correct understanding of the facts based on his prior conversations with Trooper Lash (App. 215-216, 220). Instead, on February 4, 2008, Agent Smith forwarded the warrant affidavit to Agent Mollica so that he could execute the affidavit and present it to a judicial officer in Baltimore (App. 220-221).

Brief for Appellant at 6-7, 2009 WL5635572, *U.S. v Brown*, 631 F.3d 638 (3d Cir. 2011)(No. 09-3643)(emphasis added).  In affirming this Court's suppression of the evidence, the Court of Appeals agreed that the "fact" (as it appeared at the time to all parties) that no witness had actually seen the van "meet up" with the Jetta, and yet was incorporated into the affidavit of probable cause exhibited a reckless disregard for the truth in that paragraph 7(c) appeared to be made "out of whole cloth." *Brown*, 631 F.3d at 648.  The Court of Appeals noted that the "fact that a statement is a fabrication or a figment of a speaker's imagination is sufficient reason for finding that it was not made in good faith— i.e., that it was made with (at least) reckless disregard for the truth—even if the speaker testifies that he believed the statement to be true." *Id*. at 648-49.

As it turns out, the statement in the affidavit of probable cause was neither a fabrication nor a figment of Special Agent Smith's imagination, despite the government's subsequent

concession to the same before the Court of Appeals.

3.    Request to Re-Open Suppression Hearing by the United States

Approximately one week following the mandate from the Court of Appeals, on February

24, 2011, the government moved this Court to re-open the suppression hearing. *See* Doc. No. 74.

Attached to the government's motion were various materials, specifically, email correspondence

between law enforcement agents and prosecutors, a handwritten statement of a purported

witness, Tom Klingensmith, and an unsigned, undated note, allegedly authored by Special Agent

Smith.  The government contended that on January 24, 2011, days after the decision was issued

by the Court of Appeals which affirmed the suppression of the evidence, witness Klingensmith

approached the Pennsylvania State Police with information that he had seen the van and the Jetta

together on Hobson Drive shortly after the bank robbery on October 1, 2007, and he provided a

written statement to that effect. *Id.* at ¶ 5.  The written statement detailed that Klingensmith was

interviewed by a law enforcement officer (not identified by name or by organization within the

statement itself) on the day of the robbery and that he relayed his information about having seen

the vehicles parked together at that time. *Id.* at ¶ 9.  Following Klingensmith's post-appeal

contact with the State Police, Special Agent Smith was subsequently notified.  According to the

government, the following sequence ensued:

> As is typically the case, Agent Smith maintained two different types of case files
> regarding the instant bank robbery investigation: (1) the official case file that
> included all official records and reports related to the investigation and (2) a drop file
> including telephone numbers and other personal notes and contact information.
> Although Agent Smith reviewed his official case file prior to the initial suppression
> hearing and had not seen any information relating to the van and the Jetta meeting up,
> he did not review his drop file prior to the hearing.  However, after receiving Trooper
> Lash's call about Mr. Klingensmith's phone call to [PSP] Corporal Murphy [on
> January 24, 2011], Agent Smith searched his drop file.  Agent Smith recovered his

9

handwritten note indicating that he had talked with Mr. Klingensmith previously, and that Mr. Klingensmith had in fact stated that he had seen the van and the Jetta meet up as reported in the warrant affidavit - refreshing Agent's Smith recollection as to the basis for his inclusion of paragraph 7(c) in the warrant affidavit. This handwritten note had not been formalized into an official contact or an FBI Form 302 and was therefore not a part of Agent Smith's official case file.

*Id*. at ¶ 11. In light of these recent developments, the government asked the Court to conduct a hearing and allow the government to introduce "this newly discovered evidence" as a basis to reconsider its previous suppression of evidence. *Id.* at ¶ 12.

On April 8, 2011, this Court granted the government's motion and scheduled an evidentiary hearing in order for the government to re-open its case. Doc. No. 80.

4.    July 2011: Re-Opened Suppression Hearing

The re-opened suppression hearing was conducted on July 6, 2011, during which the following witnesses testified: Corporal Joseph Murphy and Corporal Shane Lash of the Pennsylvania State Police, Mr. Thomas Klingensmith, and FBI Special Agent Robert Smith. Crucial to the Court's decision now is the testimony of Klingensmith. Unlike the 2009 suppression hearing in which all of the testimony came from government law enforcement agents, during the re-opened hearing, the Court heard testimony from a witness to one of the events that occurred shortly after the bank robbery, namely Mr. Klingensmith. His testimony provided evidence directly related to the issue of Defendant's motion to suppress because he personally observed the circumstances described in subparagraph 7(c) of the affidavit of probable cause, and, just as importantly, he provided that information to law enforcement officers on more than one occasion early in the investigation. On the morning of October 1, 2007, Mr. Klingensmith was helping his cousin apply siding to the side of his cousin's house. The cousin's

property borders Hobson Drive close to the intersection with SR 66, and Mr. Klingensmith was able to see the general area of the intersection from where he was working along the side of the house.  He testified in relevant part:

> Q:  Now, on the – that particular morning, while you were working on the siding, did you see another vehicle pull up in the vicinity of the white car?
>
> A:  Yes, the white van pulled up nose to nose with it; and my immediate assumption was, 'Oh, someone has come to either jump start or work on that little car.
>
> Q:  Where were you when you saw a white van pull up nose to nose with that vehicle?
>
> A:  Standing at the corner of Earl's house, so it would be the southeast corner I guess you'd say, next to the creek that goes under that little bridge abutment.
>
> Q:  Now, when you say nose to nose, is that your phrase or did somebody give you that phrase?
>
> A:  No, it's my phrase.  You know, head on to each other.
>
> Q:  Like the battery was going to be jumped?
>
> A:  Yes, that's correct.  That was my assumption that, you know, probably jump the battery or something.

*See* Doc. No. 88, Transcript of re-opened suppression hearing, at 86 & 87.  Klingensmith continued:

> Q:  Okay.  And did you continue observing the van to see if anybody had gotten out or anything like that?
>
> A:  I saw someone standing on the roadway, and I think I saw him adjust his cap.
>
> Q:  Okay.
>
> A:  But he was behind that bush and I could just see like the top of his head or the cap, and I didn't pay any more attention.  Maybe I got busy, handing Earl some siding or something to that effect.

11

Q:     Did you see anyone physically step out of the van?

A:     No, I didn't see them get out of the van. I saw them shortly after. They must have got out of the van. I mean, they were standing in the roadbed, the roadway.

Q:     So, you saw this person standing near the van shortly after it pulled up?

A:     That's correct, right directly in front of it.

*Id.* at 88-89. Mr. Klingensmith turned his attention back to the work that he was conducting on his cousin's house for a short period of time. He described the scene that followed:

Well, a few minutes later, Earl observed a ... I think it was an SUV, a dark one, pull into the intersection from up - heading south, pull into Hobson and stop. And he says, "Those fellows have their guns drawn. And, of course, we both looked right away, you know, and they sort of checked out the van and - some of them went down into the field. There was an obvious trail down there, and I guess they assumed that maybe somebody had gone - you know, abandoned the van and gone down through there.

*Id.* at 90. Mr. Klingensmith estimated that it was approximately 9:30 a.m. when he saw the sport utility vehicle arrive at the scene. *Id.* at 98. Prior to noticing the SUV arrive, Mr. Klingensmith did not actually see the small white car depart the area; he only noticed that the car was gone when the SUV arrived. *Id.* A short time later that morning, Mr. Klingensmith and his cousin took a break from working and entered the house, at which point he learned that the S&T Bank had been robbed from his cousin's wife. He described what followed:

That's when it sort of fell together what had been going on for us. ... I said, "Earl, that Jetta was gone when that SUV with the policemen showed up. That's how they got away." So I then ran out the door, and there was a state policeman coming down Hobson from Fort Cliff; and I flagged him down, told him what I knew or what I had seen, and he said, "We'll get back to you."

Doc. No, 88 at 93 - 94. Although he never learned the identity of this officer that he flagged down at that point, Mr. Klingensmith testified that the officer was in a marked state police car

and wearing a uniform at the time. *Id*. at 105. As it turns out, this was the first of three contacts between Mr. Klingensmith and law enforcement officers investigating the robbery during which he provided information about what he had seen earlier that day. Mr. Klingensmith testified regarding the second encounter, during which two officers approached him relatively early that afternoon after he had resumed working on the outside of his cousin's house:

> A:     ... A couple of officers came over that afternoon and interviewed us. I am not sure of the timing, maybe two o'clock, one o'clock - I don't know.
>
> ...
>
> Q:     And where - what did you tell this officer? Well, first of all, how many officers did you talk to?
>
> A:     I believe there were two.
>
> Q:     And were they uniformed?
>
> A:     I believe one of them was and one wasn't, but that's just my recollection of the day.
>
> Q:     And what did you tell these officers?
>
> A:     I related the story that I've just told you, that there had been a white van that pulled in nose to nose with that little white compact car, and my assumption was that they were going to work on it. And I saw somebody standing in the roadway. I must have, you know, not been paying real close attention at that time. I didn't see him get out, but I saw him standing in the roadway. I think he was adjusting his cap.
>
>     And a little bit later, the police vehicle pulled in or - the SUV, a dark color. I don't think it was marked or anything. And they got out and Earl mentioned that, hey, they have their guns drawn; ...

Doc. No. 88 at 94 - 95. Mr. Klingensmith estimated that this second encounter occurred approximately "an hour or two" after he flagged down the State Trooper who was driving the vehicle, and that this discussion lasted for approximately "ten or fifteen minutes". *Id*. at 106 &

108. Once again, he did not recall the actual identity of the two officers with whom he spoke, although he did remember that neither identified themselves as a special agent with the FBI. *Id.* at 109.

A short time later, also during the same afternoon, Mr. Klingensmith spoke with law enforcement a third time about what he saw. He testified about that encounter as follows:

> Q: All right. Now, when was the - did you talk to any other law enforcement officers that day about the robbery after the second incident?
>
> A: Yes. We walked over to the area by the bridge there. I believe they were trying to determine if there were any tire marks or how far apart the two vehicles or footprint; and I tried to pinpoint about where the small white compact car was setting in relation to the van.
>
> Q: Okay, And do you remember how many officers you talked to when you went over there?
>
> A: There were several there at the time.

Tr. at 96. During the course of this discussion, Mr. Klingensmith and the officers "tried to pinpoint exactly where the small white vehicle was". *Id.* at 107. This third encounter was the final encounter Mr. Klingensmith had with law enforcement until he initiated contact with the State Police in January of 2011. *Id.* at 96. He testified as to that which prompted him to initiate this most recent contact as follows:

> Q: What promoted you to make that call and when did you make it?
>
> A: I found a short article in the newspaper - this one- relating that the case had been thrown out of court for - because they couldn't tie the small white car and the van as being at that spot at the same time. And I said to my wife, "That's not correct." I said, "They were both there."
>
> Q: And so did you call the state police?
>
> A: I called the state police and told them.

14

Q:      Okay.

A:      And they arranged for me to come in a week or so later to make a statement and talk about it.

Tr. at 96 - 97. On January 31, 2011, Mr. Klingensmith was interviewed by Corporal Murphy and State Trooper Rick Fennell at the Kittanning State Police barracks, during which he recounted what he remembered seeing on the day of the bank robbery.

Special Agent Robert Smith testified during the re-opened hearing. He briefly described the structure and organization under which he operates. He, along with two other special agents, operate out of a small FBI office in Cranberry Township, PA, while his supervisor is located in Erie, PA. Doc. No. 88 at 116. The official investigation files are maintained in Erie. *Id*. at 116 - 117. However, the special agents in the Cranberry office are able to access and retrieve those portions of the investigation file that are stored electronically online without having to travel to the Erie office. *Id*. at 117. As to certain documents, Special Agent Smith would make copies for his own working file that he maintained in Cranberry before sending the original documents to Erie. *Id*. The purpose of this file, which he referred to as his "drop file" or "personal file", was to afford him local access to pertinent copies of documents that he may need to maintain for review purposes over the course of the investigation. *Id*.

Special Agent Smith testified regarding the FBI policy with respect to interviews of witnesses, and specifically on the preparation of reports of interviews. Doc. No. 88 at 118. Under that policy, a special agent is expected to memorialize interviews of witnesses on an FD-302 form within five days of the interview. *Id*. Notes of the interview are sealed in an FD-340 envelope, which, along with the FD-302, is incorporated into the investigation file. *Id*. At the

same time, however, Special Agent Smith testified that agents do not necessarily generate formal reports of interviews ("302's") for each and every person they contact during the course of an investigation. *Id.* at 119. An example of a situation in which a 302 would not be generated is one in which other investigators from other agencies having access to the same information are involved. *Id.* In such cases, an informal agreement between the agents from the various agencies would delineate who would generate a report from a particular interview. *Id.* Special Agent Smith typically kept copies of 302's, copies of police reports, and copies of certain evidentiary reports in his drop files. *Id.* at 120.

Special Agent Smith testified that on the date of the bank robbery, he was the sole FBI agent who responded to the scene by traveling to the S & T Bank. Doc. No. 88 at 121. There, he personally interviewed three bank tellers, and prepared FD-302 reports for each. *Id.* From there, he proceeded to a Sheetz gas station in the vicinity in order to determine if possible video surveillance footage from the station contained useful information. *Id.* at 122. He spoke with an employee there, but he was not able to access the surveillance footage at that time. *Id.* He did not generate a 302 for this contact. *Id.* He then proceeded to Hobson Drive where the van was found. *Id.* at 122 - 23. His arrival on the scene was on or around 12:30 p.m., and he stayed on site for a half an hour to forty-five minutes. *Id.* at 123. He was not there to process the scene, but was there solely for observational purposes. *Id.* at 125. He was standing in the middle of the street with a uniformed State Trooper close to the parked van when he was approached by Mr. Klingensmith. *Id.* at 125. Special Agent Smith recalled that he spoke with Mr. Klingensmith for two to three minutes. *Id.* at 126. He did not prepare an FD-302 form following his conversation with Mr. Klingensmith. *Id.* He did, however, jot some notes while speaking with Mr.

Klingensmith, which were admitted into evidence without objection during the hearing as Government's Exhibit 13. In relevant part, exhibit 13 included Mr. Klingensmith's name, phone number and following summary:

> Van pulled, two people, thought vehicle was going to assist first car, nose to nose. Saw car last night. Rag, white, hanging from window. Assumed broken-down vehicle.

Special Agent Smith placed this single note sheet in his drop file, where it remained until January of 2011. *Id*. Approximately four months after this conversation with Mr. Klingensmith, Special Agent Smith prepared the affidavit of probable cause for the search warrant to obtain the DNA evidence of Defendant. Special Agent Smith's reference to a witness having seen the van "meet up with" a small white car shortly after the bank robbery was based upon his interaction with Mr. Klingensmith. *Id*. at 128.

During the re-opened hearing, Special Agent Smith was questioned about his testimony during the earlier suppression hearing, and specifically why his 2011 testimony differed from that previously provided, and he responded that at the earlier hearing, he simply had forgotten his conversation with Mr. Klingensmith. *Id*. at 129. He testified that when preparing for his testimony in 2009, he reviewed copies of police reports, and the electronically stored content of the original file maintained in Erie, including the FD-302's of his interviews with the bank tellers. *Id*. at 129 - 30. While he did review his drop file in preparation for the 2009 hearing, he did not do so with great attention to detail. *Id*. at 130 - 31. This was due to the fact that he had forgotten about his conversation with Mr. Klingensmith, and therefore focused his attention on the state police reports, expecting to find a reference in those reports to a witness having seen the vehicles "meeting up". *Id*.; *see also*, *id*. at 136 ("To say that I took out every single piece of parer in this

[drop file], I didn't, again, the reason being is I had no expectation of finding a note of interview of a person that I completely forgot having interviewed."); *see also id*. at 149 ("I looked at the state police report. I looked at my official reports pertaining to interviews that I had conducted; and, again, I had no recollection of having interviewed Mr. Klingensmith and had no expectation of finding any - any note pertaining to such an interview.")

In sum, throughout the course of preparing for and participating in the 2009 hearing, Special Agent Smith was under the misapprehension that the information described in subparagraph 7(c) was documented in state police reports. When he was unable to actually find that information where he expected it to be, he "was at a loss." Doc. No. 88 at 152. Ultimately, he did not re-discover his notes regarding his conversation with Mr. Klingensmith until he more closely reviewed his drop file after receiving a call from Trooper Lash on January 24, 2011, following Mr. Klingensmith's contact with the state police. *Id*. at 131.

## ANALYSIS

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the United States Supreme Court held that the Constitution allowed criminal defendants, in some circumstances, "to challenge the truthfulness of factual statements made in an affidavit supporting the warrant," even after the warrant had issued. 438 U.S., at 155-56, 98 S.Ct. 2674. If those false statements were necessary to the Magistrate Judge's determination of probable cause, the warrant would be "voided". *Id*. At a *Franks* hearing, "the defendant must ultimately prove by a preponderance of the evidence: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to

the probable cause determination." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir.2006) (internal citations omitted). The Court of Appeals for the Third Circuit has previously explained that "[a]n assertion is made with reckless disregard when viewing all the evidence, the affiant must have entertained serous doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)(internal quotation marks and citation omitted).

In view of the evidence now before it, the Court finds that the affidavit of probable cause did not contain false information. The Court credits the testimony of Mr. Klingensmith as clear and uncontroverted that he saw the van and the silver vehicle parked "nose to nose" with one another along Hobson Drive shortly after the bank robbery, and an unidentified individual standing on the road along the passenger side of the van. Mr. Klingensmith also observed that when the SUV driven by law enforcement agents arrived a short time later, the silver vehicle was no longer there. Further, the evidence is clear and uncontroverted that Mr. Klingensmith communicated his observations to various law enforcement officers that day on three separate occasions, one of whom was Special Agent Smith.

Although it formerly appeared that Special Agent Smith had no factual justification to affirmatively support the assertions in subparagraph 7(c) of the affidavit, such is no longer the case. The limitations of human memory on the part of Special Agent Smith, as well as less-than-judicious memorialization of investigative developments by both Special Agent Smith and the unnamed State Police officers who also interacted with Mr. Klingensmith that day, previously led this Court to conclude that the challenged portion of the affidavit of probable cause was made up from whole cloth. The Court now knows what Mr. Klingensmith observed on October 1,

2007, the day of the robbery, and also knows that Special Agent Smith knew of Mr.

Klingensmith's observations at the time he prepared the affidavit of probable cause. As such,

Mr. Klingensmith's statements to Special Agent Smith on October 1, 2007, provided the

evidentiary basis for the averments in subparagraph 7(c), as same was known to the officer who

prepared the affidavit in support of the application for the search warrant prior to its preparation.

The Supreme Court has repeatedly held that the deterrent effect of suppression must be

substantial and outweigh any harm to the justice system. *See*, *e.g.*, *Herring v. U.S.*, 555 U.S. 135,

147-48, 129 S.Ct. 695, 704, 172 L.Ed.2d 496 (2009); *U.S. v. Leon*, 468 U.S. 897, 909–910, 104

S.Ct. 3405, 82 L.Ed.2d 677 (1984). Likewise, as the Court of Appeals very recently explained:

> Suppression of valuable evidence imposes social costs by hindering the courts' truth-
> seeking function, but the Supreme Court has determined that those costs are
> outweighed by the need to prevent illegal and culpable law enforcement conduct. ...
> Accordingly, '[t]o trigger the exclusionary rule, police conduct must be sufficiently
> deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such
> deterrence is worth the price paid by the judicial system.'

*People of the Virgin Islands v. John*, Civ.A.No. 09-4185 (3d Cir. Aug. 15, 2011)(quoting,

*Herring*, 555 U.S., at 144, 129 S.Ct. at 702). Any error in this case simply does not rise to that

level. The error in this case, such that it was, is limited to the affiant agent's preparation for the

2009 suppression hearing, as opposed to the preparation of the affidavit in support for the

application for the search warrant itself in January of 2008. The Court finds that Special Agent

Smith's inability to recall Mr. Klingensmith as the source of the challenged evidence is, at most,

the result of the combination of his imperfect memory and perhaps a degree of negligence for his

failure to fully review his drop file in preparation for the first suppression hearing, both of which

occurred in the summer of 2009. On a deeper level, however, and more germane to Defendant's

motion to suppress itself, is the fact that the evidence offered by and through Mr. Klingensmith establishes that the information contained in the warrant affidavit that was material to the probable cause determination was not false. As such, the fact that it was incorporated into the warrant application negates this Court's previous finding that its inclusion was a reckless disregard for the truth, which formed the basis for this Court's suppression of the evidence. Further, any such post-warrant error on the part of Special Agent Smith does nothing to impugn the veracity of the information in the affidavit of probable cause itself.

That is not to say that the sequence through which this issue has proceeded has been of the kind that is encouraged. As the parties well know, and the docket amply reveals, the issue of Defendant's motion to suppress has consumed more than two years of active litigation, an evidentiary hearing in 2009, a re-opened evidentiary hearing in 2011, as well as an argument before the Court of Appeals in 2010 and the resulting decision affirming this Court's previous ruling. All of which could have easily been avoided had the investigation file more readily highlighted the information that Mr. Klingensmith provided to law enforcement on the day of the robbery. Nevertheless, as the Supreme Court once held, "a criminal should not 'go free because the constable has blundered.'" *Herring*, 555 U.S., at 148, 129 S.Ct., at 704 (quoting *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926) (opinion of the Court by Cardozo, J). "Allegations of negligence or innocent mistake are insufficient" to warrant suppression. *Franks*, 438 U.S., at 171. Such is the case here.

Given this finding, the Court considers the other aspect of Defendant's original challenge to the search warrant, that is, his contention regarding the omission of material facts in subparagraphs (a) and (b) of paragraph 7 of the affidavit of probable cause in support of the

warrant application. Those provisions stated the following:

Through investigation, your affiant has learned the following:

(a) a credible source of information disclosed that in the time preceding the robbery three individuals known to this source as Perry Bell and John Wingate, both of Ford City, PA, and Allen Brown, a relative of Wingate visiting from Baltimore, Maryland, had spent time together in Ford City.

(b) after the robbery, PSP Troopers interviewed John Wingate who indicated on the morning of the crime he saw Allen Brown leave an address in Ford City at around 8 a.m. in a silver Volkswagen Jetta. Your affiant has since determined that Allen Brown operated a silver or gray Volkswagen Jetta with Maryland registration. Wingate further stated that at 10 a.m., or thereabout on the same day, he saw Perry Bell and Allen Brown return in the silver Jetta to the address from which Brown had departed earlier in the day.

*See* Search Warrant, filed at exhib. 1 of Doc. No 51.

Defendant challenged three aspects of the investigation that were omitted from the affidavit: the affidavit failed to inform that John Wingate was a possible suspect in the robbery; the affidavit failed to inform that John Wingate had provided false information regarding Defendant's whereabouts in the first of two interviews with police; and the affidavit failed to incorporate a potentially exculpatory explanation provided by John Wingate as to what Defendant was doing on the morning of the bank robbery. Doc. No. 51.

As this Court previously held following the first suppression hearing, a defendant must prove by a preponderance of the evidence that the omission of facts in the affidavit was material to the original probable cause determination. *Yusuf*, 461 F.3d at 383. Omissions are made with reckless disregard for the truth if an officer withholds a fact or facts in his ken that "[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know." *Wilson*, 212 F.3d at 787 (adopting the approach of the Court of Appeals of the Eighth

Circuit, as articulated in *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir.1993)). When faced with an omission, a court removes the falsehood created by an omission by supplying the omitted information to the original affidavit. *Yusuf*, 461 F.3d at 384.

As Defendant correctly noted, John Wingate, Defendant's uncle, was considered a possible suspect in the bank robbery, a fact that was not revealed in the affidavit. The investigation reflects that a bank teller victim of the robbery, Ms. Myschisin, and other tellers believed that they recognized the voice of one of the bank robbers as John Wingate, a regular customer of the bank. Trooper Lash, early in the investigation, advised Special Agent Smith that John Wingate was a potential suspect and that Trooper Lash was attempting to locate and speak with him. While this fact was communicated from the PSP to the FBI Pittsburgh field office, it was not conveyed from the FBI Pittsburgh field office to the FBI Baltimore field office nor to the Magistrate Judge who issued the warrant. Special Agent Mollica testified during the 2009 hearing that he did not know that John Wingate, Defendant's uncle, was a possible suspect. In fact, as far as Special Agent Mollica knew, it was James Wingate, believed to be Defendant's brother, who was considered a suspect along with Defendant, not John Wingate. According to the information known to Special Agent Mollica, the uncle, John Wingate, was considered little more than a "mildly cooperative" witness. (Def. Ex. A).

As this Court previously held, John Wingate being considered as a possible suspect who gave conflicting accounts of Defendant's whereabouts is clearly the kind of information that a reasonable person would know and that the Magistrate Judge would want to consider. As perhaps the most telling illustration of this determination, Special Agent Mollica himself testified on cross-examination that had he known that John Wingate was considered a possible suspect,

that fact would have been included in the affidavit. Instead, John Wingate is actually presented as an important source of information, untainted by the cloak of suspicion, who placed the Defendant in a gray Volkswagen Jetta in Ford City for the two hour period during which the robbery occurred. This Court previously found that such a misrepresentation by omission was not insignificant.

Defendant also argued that the affidavit omitted a material fact by also failing to note that John Wingate gave conflicting accounts to investigators. In an interview on November 3, 2007 ("the first interview"), John Wingate denied that "Dink" was in Ford City visiting him on the weekend of the robbery. Another interview with John Wingate was conducted on December 11, 2007 ("the second interview"), during which Wingate acknowledged that the Defendant was in fact in Ford City that weekend, and that he did misrepresent the Defendant's whereabouts in the first interview. Defendant argued that this sequence of inconsistent statements was a material omission in that it degrades the credibility of the assertions made during the second interview. Doc. # 51 at pp. 11-12. The Court agreed to the extent that, in view of the fact that Wingate was a suspect, his inconsistencies between the two interviews would have been the kind of information that it is reasonable to conclude the Magistrate Judge would have wanted to know. Doc. No. 60.

The analysis does not stop there, however. The Court must now consider whether Defendant has met his burden of proving that probable cause did not exist under the affidavit, with the previously omitted facts being incorporated into it. In conducting this analysis, the Court must examine the "totality of the circumstances" as set forth in the affidavit. *Yusaf*, 461 F.3d at 390. Under this flexible standard, "the task ... is simply to make a practical,

common-sense decision whether, given all the circumstances set forth in the affidavit[,] ... including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).  That determination does not require absolute certainty that evidence of criminal activity will be found at a particular place, but rather that it is reasonable to assume that a search will uncover such evidence.  *Id.*; *see also United States ex. rel Campbell v. Rundle*, 327 F.2d 153, 163 (3d Cir.1964) ("[P]robable cause which will justify the issuance of a search warrant is less than certainty of proof, but more than suspicion or possibility, the test being whether the allegations of the supporting affidavit warrant a prudent and cautious man in believing that the alleged offense has been committed.") (citation omitted).

The Court finds that the totality of the circumstances reflected in a corrected affidavit readily demonstrates probable cause.  More particularly, the information developed in the course of the investigation demonstrated that Defendant was the nephew of John Wingate, that he lived in Maryland, that he owned a vehicle similar in description to that which was observed parked along Hobson Drive, and that he visited his uncle in Ford City at the time of the robbery.  Beyond the information coming from John Wingate himself in the two interviews, the Court notes in relevant part the following sources of information that were also obtained.  On November 1, 2007, Edward Bell, Jr. informed Trooper Lash that John Wingate has a nephew who goes by the nickname of "Dinky" who lives in Maryland, drives a silver car, and visits Wingate frequently. *See* Doc. No. 51 at exhib. 2, admitted during the first suppression hearing as Def. Ex. D.  On November 3, 2007, John Wingate was interviewed by Trooper Lash in Stanley's Bar in Ford City.

Wingate admitted that he has a nephew who goes by the name "Dink", who is the son of his sister Judith Brown and lives in Temple Hills, Maryland. Wingate admitted that "Dink" had visited him during the middle of September of 2007, but denied that "Dink" was in the area during the weekend of the robbery. *Id.* In an interview conducted on November 4, 2007, Maxine L. Russell informed Trooper Lash she saw "Dink" come into the Ford City Citgo station where she worked on the Saturday before the robbery, which would have been September 29, 2007. He was driving a burgundy and tan Mitsubishi Montero. John Wingate was with him at the time, along with a third person. *Id.* Also on November 4, 2007, Judith Brown was contacted via telephone by Trooper Lash and admitted she has a son Allan Brown who has the nickname "Dink". *Id.* at p. 12. On November 15, 2007, Trooper Lash received a report from Special Agent James Mollica of the Baltimore field office, forwarded by Special Agent Smith, which detailed an interview with Judith Brown. Among other things, she admitted that Defendant owns a silver Volkswagen Jetta and that he visited his uncle John Wingate in Ford City, PA, at the end of September. *Id.*

Taken together, the Court finds that the facts omitted from the affidavit in support of the application for the warrant were not material to the determination of probable cause, as probable cause existed under the circumstances of the investigation at the time of the warrant application, even upon the consideration of the affidavit of probable cause with the omitted facts being included.

**CONCLUSION**

For the reasons hereinabove stated, the Court will vacate its previous ruling which granted Defendant's Motion to Suppress, and will deny said motion. An appropriate order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **2:08-cr-299** |
| **v.** | ) | |
| | ) | |
| **ALLEN BROWN also known as** | ) | |
| **ALLAN BROWN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER OF COURT**

AND NOW, to wit, this 19<u>th</u> day of <u>August</u>, 2011, in accordance with the foregoing

memorandum opinion, it is **ORDERED**, **ADJUDGED**, and **DECREED** that the Order of Court

filed on August 12, 2009, at Doc. No. 60, that granted DEFENDANT ALLEN BROWN'S

MOTION TO SUPPRESS EVIDENCE UNDER <u>FRANKS V. DELAWARE</u> WITH CITATION

OF AUTHORITY is **VACATED**.

It is further **ORDERED** that DEFENDANT ALLEN BROWN'S MOTION TO

SUPPRESS EVIDENCE UNDER <u>FRANKS V. DELAWARE</u> WITH CITATION OF

AUTHORITY, Doc. No. 51, is hereby **DENIED**.

BY THE COURT:

<u>s/Terrence F. McVerry</u>
United States District Court Judge

cc:   Shaun E. Sweeney,
Assistant United States Attorney
Email: shaun.sweeney@usdoj.gov

Marketa Sims,
Assistant Federal Public Defender
Email: marketa_sims@fd.org